Vincent F. Gerbino (VG 0555)
BRUNO, GERBINO & SORIANO, LLP
445 Broad Hollow Road, Suite 420
Melville, New York 11747
Telephone: (631) 390-0010
Facsimile: (631) 393-5497

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

|  |  |
|---|---|
| Plaintiffs, | Docket No.:_____( ) |
| -against- | **Plaintiffs Demand a Trial By Jury** |

CECILE I FRAY, M.D., PLLC,
CECILE INGRID FRAY, M.D.,
RAP SERVICES, INC.,
VALERY KOTLYAR A/K/A VALERIY KOTLYAR,
JOHN DOES 1 through 20,
ABC CORPORATIONS 1 through 20,

Defendants.
------------------------------------------------------------------------X

## COMPLAINT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively referred to as

"GEICO"), by and through their counsel, Bruno, Gerbino & Soriano, LLP, as and for their

Complaint against the Defendants, hereby allege, upon information and belief, as follows:

1

## I.    INTRODUCTION

1.      This action seeks to recover more than Two Hundred Forty-One Thousand Eight Hundred Dollars and Nineteen Cents ($241,800.19) that the Defendants have acquired from the Plaintiffs by submitting, and causing to be submitted, thousands of fraudulent No-Fault insurance charges for a variety of excessive and unnecessary healthcare services, including patient examinations and diagnostic testing (collectively, the "Fraudulent Services") and further seeks a declaration that GEICO is not legally obligated to pay reimbursement of Two Million Twenty-Three Thousand Four Hundred and Five Dollars and Ten Cents ($2,023.405.10) in pending charges.  Defendant Cecile I Fray, M.D., PLLC is a transient healthcare provider who travels to various multidisciplinary medical facilities to purportedly render the fraudulent services upon individuals ("Insureds") who were involved in automobile accidents and eligible for insurance coverage under the Plaintiffs' insurance policies.  The actions taken by the Defendants were part of a scheme perpetrated against the Plaintiffs whereby the fraudulent services provided, to the extent that they were provided at all, were based upon a preset protocol designed solely to maximize the amount of billing submitted to the Plaintiffs without regard to the health and welfare of the Insureds.

2.      The actions taken by the Defendants were part of a scheme perpetrated against the Plaintiffs whereby the treatment provided, to the extent that it was provided at all, was based upon a preset protocol designed solely by laypersons who direct the manner in which the Fraudulent Services are rendered so as to maximize the amount of billing submitted to the Plaintiffs without regard to the injuries allegedly sustained or the individual needs of the patients.

3.      This action further seeks a declaration that Defendant, Cecile I Fray, M.D., PLLC, is not entitled to receive No-Fault reimbursements for services allegedly rendered and/or provided

2

as the Defendant failed to meet a material condition precedent to coverage as set forth in the

applicable policy of insurance as well as the No-Fault Regulation by refusing and failing to appear

for duly scheduled Examinations Under Oath ("EUOs").

       4.      Thus, GEICO seeks a declaration that it is not legally obligated to pay any pending

No-Fault insurance claims that have been submitted by or on behalf of Defendant Cecile I Fray,

M.D., PLLC, because of the following:

      i)      the Fraudulent Services were not medically necessary and were provided, to the extent that they were provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to diagnose or otherwise benefit the Insureds who purportedly were subjected to them;

      ii)      in many cases, the Fraudulent Services were never provided in the first instance;

      iii)      the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to the Plaintiffs;

      iv)      the Fraudulent Services were provided, to the extent that they were provided at all, pursuant to illegal kickback arrangements between the Defendants and others;

      v)      Defendant Cecile I Fray, M.D., PLLC is controlled by Defendants, Valery Kotlyar a/k/a Valeriy Kotlyar, John Does 1 through 20 and ABC Corporations 1 through 20, who are unlicensed individuals or nonprofessional corporations, and are ineligible to bill for or to collect no-fault benefits;

      vi)      That Defendant, Cecile I Fray, M.D., PLLC, lacks standing to seek or receive No-Fault reimbursements for any bill submitted for which an EUO was requested and for which the Defendant failed to appear; and

      vii)      That Defendant, Cecile I Fray, M.D., PLLC., breached a condition precedent to coverage as established by the subject policy of insurance and the accompanying No-Fault endorsement by failing to appear for an EUO.

       5.      The Defendants fall into the following four categories:

      i)      Defendant, Cecile I Fray, M.D., PLLC (hereinafter "FRAY" or the "PC

Defendant"), is a medical professional corporation through which the Fraudulent Services were performed and billed to GEICO.

ii)     Defendant, Cecile Ingrid Fray, M.D. ("Dr. Fray"), is a licensed neurologist who purports to own the PC Defendant and performs the Fraudulent Services, and has submitted bills to GEICO through FRAY.

iii)    Defendants, Valery Kotlyar a/k/a Valeriy Kotlyar (hereinafter "Kotlyar"), John Does 1 through 20 and ABC Corporations 1 through 20 are laypersons or nonprofessional corporations (collectively referred to as "Management Defendants") that have controlled the operation and management of the PC Defendant and crafted a billing and treatment protocol that was executed for the purposes of billing GEICO for Fraudulent Services.

iv)     Defendant, RAP Services, Inc. (hereinafter "RAP Services"), is a nonprofessional corporation owned by Defendant, Kotlyar, through which kickbacks are paid.

6.      As discussed below, Defendants at all relevant times have known that:

i)      the Fraudulent Services were not medically necessary and were provided, to the extent that they were provided at all, pursuant to a pre-determined protocol that was designed to maximize charges to GEICO, not because they were medically necessary;

ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

iii)    the pre-determined protocol of treatment and billing was subject to the direction and control of persons that were not licensed to practice medicine, resulting in the performance and billing for unnecessary and inflated charges to GEICO.

7.      As such, the Defendants are not and have never been eligible to be compensated for the Fraudulent Services.

8.      The chart annexed hereto as **Exhibit "1"** set forth the fraudulent claims that have been identified to date that the Defendants submitted, or caused to be submitted, to GEICO by, Defendant FRAY. The chart annexed hereto as **Exhibit "2"** set forth a list of claims submitted by Defendant FRAY which were denied based upon the failure of the Defendant to appear for an

4

EUO.

9.      The Defendants' fraudulent scheme began as early as 2014 and has continued uninterrupted through present day.

10.     As a result of the Defendants' conduct, GEICO has incurred damages in excess of Two Hundred Forty-One Thousand Eight Hundred Dollars and Nineteen Cents ($241,800.19).

## II.    PARTIES

### A.     Plaintiffs

11.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company ("GEICO") are Maryland corporations with their principal place of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in the State of New York.

### B.     Defendants

12.     Defendant, Dr. Fray, resides in and is a citizen of New York. Dr. Fray was licensed to practice medicine in New York on September 2, 1986, specializes in pediatric neurology, and purports to provide many of the Fraudulent Services through FRAY.

13.     Defendant, FRAY, is a New York professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to GEICO. FRAY is owned by Defendant Dr. Fray.

14.     Defendant Kotlyar resides in and is a citizen of the State of New York. Kotlyar is not and has never been licensed to practice medicine. However, Kotlyar has, at all relevant times, illegally practiced medicine by effectuating and implementing a billing and treatment protocol

5

associated with the Fraudulent Services and has exercised control over the PC Defendant with respect to the practice of medicine.

15.    Defendant, RAP Services, is a New York nonprofessional construction corporation with its principal place of business in New York, through which illegal kick-back payments were paid by Defendants Dr. Fray and FRAY. Defendant, RAP Services, is owned by Defendant Kotlyar.

16.    Upon information and belief, John Does 1 through 20 are individuals, presently not identifiable, who are not and never have been licensed professionals, yet have owned, controlled and derived economic benefit from Defendant FRAY in contravention of New York law.

.    17.    Upon information and belief, ABC Corporations 1 through 20 are New York nonprofessional corporations are companies, presently not identifiable, that are owned, controlled and operated by either John Does, and which entered into ostensible agreements and other contracts with Defendant FRAY, and were used to funnel money to either John Doe. Upon information and belief, the ABC Corporations are also the alter egos of either John Doe and conspired and assisted in the fraudulent conduct alleged herein. These corporations will be added as defendants when their names and the extent of their participation become known through discovery.

## III.    JURISDICTION AND VENUE

18.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of this Complaint occurred.

## IV.     ALLEGATIONS COMMON TO ALL CLAIMS

### A.     An Overview of the No-Fault Law

20.     The Plaintiffs underwrite automobile insurance in the State of New York.

21.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Reparations Act (N.Y. Ins. Law Section 5101, *et seq.*) and the No-Fault Regulation (11 NYCRR 65, *et seq.*) automobile insurers are required to provide personal injury protection benefits ("No-Fault benefits") to their insureds.

22.     No-Fault benefits include up to $50,000.00 per insured for necessary expenses that are incurred for healthcare goods and services. An insured can assign his/her rights to the provider(s) of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered by submitting the claim form required by the New York State Department of Insurance, commonly referred to as an "NF-3".

23.     Pursuant to the No-Fault Regulation and the cases interpreting same, a professional corporation is not eligible to bill for or collect No-Fault benefits if it is fraudulently incorporated.

24.     The applicable portion of the Regulation, found at 11 NYCRR 65-3.16(a)(12), states, in relevant part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails

to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

25.     In New York, only a licensed healthcare professional may: practice such profession; own and control a professional service corporation authorized to practice such profession; employ and supervise other professionals in that profession; and, absent statutory exceptions not applicable in this case, derive economic benefit from a healthcare professional's services. See generally New York Business Corporation Law §§ 1501, 1503, 1507 and 1508; Limited Liability Company Law §§ 1201, 1203a, 1207, 1211; New York Education Law §§ 6509, 6512 6513, 8212.

26.     The practice of a profession or use of professional title by one who is not licensed to practice that profession is a felony pursuant to New York's Education Law §§ 6512 and 6513. The sale of a professional license is also a felony under New York's Education Law §6512. This statutory framework is designed to protect the public and ensure that professional services are provided by licensed professionals in that field of practice.

27.     Pursuant to the No-Fault Regulation, only healthcare providers in possession of a direct assignment of benefits are entitled to bill and collect No-Fault benefits. There is both a statutory and regulatory prohibition against payment(s) of No-Fault benefits to anyone other than the patient or his or her healthcare provider.

28.     For a healthcare provider to be eligible to bill and to collect charges from an insurer of healthcare services pursuant to Insurance Law Section 5102(a), it must be the actual provider of the service. Under the Insurance Law and No-Fault Regulation, a professional service corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who are not employees of the professional corporation.

8

29.     In the interest of protecting patients, New York limits the ownership and payment of healthcare services to licensed professionals and strictly circumscribes the ability of laypersons to engage in the business of healthcare services.  Accordingly, not only is a layperson prohibited from the practice of a profession, laypersons may not own, operate, or derive economic benefit from a professional healthcare practice.

**B.      Only a Licensed Professional Can Own A Professional Corporation or Profit from a Professional Liability Company Which Performs Such Professional Healthcare Service(s)**

30.     Historically, the No-Fault system has been a vehicle utilized by unscrupulous individuals as a means to submit fraudulent insurance claims for financial gain.

31.     In the State of New York, to the extent that a healthcare practitioner wishes to provide professional services through a corporate entity, that individual must be appropriately licensed by the State and provide such services through a legally constituted professional corporation or PLLC. See Business Corporations Law (BCL) § 1501, *et seq.*; Limited Liability Company Law (LLC) § 1201, *et seq.*

32.     The owners or members of a professional corporation or PLLC must be professionals who are licensed to practice the profession. BCL § 1503; LLC §§ 1203, 1204.  An individual not licensed within the same profession as the professional corporation may not engage in the practice of the profession or be a voting member of a professional corporation that provides such services, neither may a non-professional be a member of a PLLC organized for the purposes of rendering a professional service. BCL §§ 1504, 1508; LLC §§ 1203, 1207, 1209.  A professional corporation or PLLC cannot engage in any profession or business outside the scope of the professional services for which it was incorporated. BCL § 1503; LLC § 1206. Furthermore, a healthcare professional may not share control their practice or split fees or with individuals who

9

are not licensed in their profession. N.Y. Educ. Law. § 6530(19).

33.     The authority of a professional corporation or PLLC to deliver services is contingent upon its continuing compliance with New York's Business Corporation Law, Education Law, and Professional Limited Liability Company Law. Here, the Complaint alleges violations of the Business Corporation Law, Education Law, No-Fault Regulation and the Professional Limited Liability Company Law. These violations stand as a direct impediment to the PC Defendant's entitlement to No-Fault benefits.

**C.      Improperly Incorporated Professional Corporations Cannot Receive No-Fault Reimbursements**

34.     In State Farm v. Mallela, 4 N.Y.3d 313 (N.Y. 2005), the Court of Appeals upheld an insurer's right to investigate the ownership of a medical professional corporation. The Court held that an insurer has no obligation to honor any claims submitted for No-Fault reimbursements from facilities that are not actually owned by the required professional(s). The Court in Mallela also set forth that an insurer has a right to bring an action against any entity that it paid No-Fault reimbursements to, if that entity is subsequently determined not to be entitled to No-Fault reimbursements due to invalid or improper ownership.

35.     The basis of the Mallela decision that an invalid or improperly owned professional corporation is not entitled to No-Fault reimbursements is founded in the No-Fault Regulation, the Business Corporation Law, Education Law and opinions issued by the Department of Insurance. The relevant regulatory and statutory provisions violated by the defendants in this matter are as follows: 11 NYCRR § 65-3.16(a)(12); New York Business Corporation Law §§ 1501, 1503, 1507 and 1508; New York Education Law §§ 6507, 6513, 6522 and 6530; and Professional Limited Liability Company Law §§ 1201, 1203a, 1207, 1211.

36.     Pursuant to the Court of Appeals decision in Mallela and the relevant statutory

10

provisions outlined above, the PC Defendant allegedly owned by Dr. Fray is not entitled to No-Fault reimbursements since the evidence leads to the conclusion that the Management Defendants were, in fact, controlling it in violation of the law.

### D.       Requirement to Appear for an Examination Under Oath

37.       The No-Fault Regulation (the "Regulation") governs all claims for injuries made as a result of an automobile accident within the State of New York.

38.       The Regulation provides certain tools and mechanisms for an insurance carrier to investigate an accident and to confirm the services allegedly provided as a result of any accident – this is done through conditions precedent to coverage or verification requests.

39.       The conditions precedent to coverage states the following at 11 NYCRR 65-1.1:

> MANDATORY PERSONAL INJURY PROTECTION ENDORSEMENT,
> SECTION I, *Conditions*
>
> No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage.
>
> \*                      \*                      \*
>
> Proof of Claim; Medical, Work Loss, and Other Necessary Expenses. In the case of a claim for health service expenses, **the eligible injured person or that person's assignee or representative shall** submit written proof of claim to the Company, including full particulars of the nature and extent of the injuries and treatment received and contemplated, as soon as reasonably practicable but, in no event later than 45 days after the date services are rendered. The eligible injured person or that person's representative shall submit written proof of claim for work loss benefits and for other necessary expenses to the Company as soon as reasonably practicable but, in no event, later than 90 days after the work loss is incurred or the other necessary services are rendered. The foregoing time limitations for the submission of proof of claim shall apply unless the eligible injured person or that person's representative submits written proof providing clear and reasonable justification for the failure to comply with such time

limitation. **Upon request by the Company, the eligible injured person or that person's assignee or representative shall**:

(a)    execute a written proof of claim under oath;

(b)    as may reasonably be required **submit to examinations under oath by any person named by the Company** and subscribe the same;

(c)    provide authorization that will enable the Company to obtain medical records; and

(d)    **provide any other pertinent information that may assist the Company** in determining the amount due and payable. (emphasis added)

40.    11 NYCRR 65-3.5(c) states that the "insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested." Section 11 NYCRR 65-3.8(f) dictates that nothing in the Regulation shall prevent an insurer from requesting full and complete proof of claim prior to the issuance of any payments or denials.

41.    The provision of the Conditions section that states "No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage" has been interpreted by the Courts as establishing a condition precedent to coverage.

42.    Pursuant to the applicable policy provisions, the Defendant was obligated to appear and complete an EUO as a condition precedent to coverage. Dover Acupuncture, P.C. v State Farm Mut. Auto. Ins. Co., 28 Misc. 3d 140(A), 958 N.Y.S.2d 60 (N.Y. App. Term, 1st Dep't 2010).

43.    11 NYCRR § 65-3.5(c) states that the "insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested." Section 11 NYCRR 65-3.8(f) dictates that nothing in the Regulation shall prevent an insurer from requesting full and complete proof of claim prior to the issuance of any payments or denials.

44.     It has been uniformly held that the No-Fault Regulation's requirement for an eligible injured person or their assignee to appear for an Examination Under Oath is a condition precedent to an insurer's liability under the policy. See Interboro Ins. Co. v. Clennon, 113 A.D.3d 596 (N.Y. App. Div. 2d Dep't 2014), citing Unitrin Advantage Ins. Co. v. Bayshore Physical Therapy, PLLC, et al., 82 A.D.3d 559, 560 (N.Y. App. Div. 1st Dep't 2011), leave denied, 17 N.Y.3d 705 (N.Y. 2011); See, e.g., Dover Acupuncture, P.C. v State Farm Mut. Auto. Ins. Co., 958 N.Y.S.2d 60 (N.Y. App. Term 1st Dep't 2010) (a provider's non-appearance warranted dismissal based upon "plaintiff's failure to comply with a condition precedent to coverage"); Five Boro Psychological Servs., P.C. v Progressive Northeastern Ins. Co., 911 N.Y.S.2d 392 (N.Y. App. Term 2d Dep't 2010) ("the appearance of plaintiff's assignor at an EUO was a condition precedent to defendant insurer's liability on the policy"); Stephen Fogel Psychological, P.C. v. Progressive Cas. Ins. Co. 35 A.D.3d 720, 722 (N.Y. App. Div. 2d Dep't 2006) ("The appearance of the insured for IMEs at any time is a condition precedent to the insurer's liability on the policy").

45.     Once an eligible injured person, or their assignee, fails to comply with a condition precedent as set forth in the policy endorsements at 11 NYCRR § 65-1.1, such as a medical examination or examination under oath, the carrier's requirement to timely deny the bill is vitiated and the policy is void, *ab initio*. Unitrin, 82 A.D.3d 559 citing Central Gen. Hosp. v Chubb Group of Ins. Cos., 90 N.Y.2d 195 (1997).

46.     Pursuant to the No-Fault Regulation, the Defendant, FRAY, has an absolute condition precedent to coverage to appear for an EUO.

### E.     The Defendants' Current Fraudulent Scheme

47.     Defendant Dr. Fray was licensed to practice medicine in New York on September 2, 1986, and she specializes in pediatric neurology.

13

48.     In 2004, Dr. Fray incorporated FRAY for the purpose of treating private pediatric patients in need of neurological care. The practice remains in operation and is located at 280 Broadway, Suite 2, Newburgh, New York.

49.     It is believed that on or about May of 2014, Dr. Fray was approached by Defendants Kotylar, John Does 1 through 20 and ABC Corporations 1 through 20 with a scheme to commit No-Fault insurance fraud. It is the same scheme the Management Defendants presented to other healthcare professionals whom it is believed they agreed to and are or were actively participating in.

50.     This scheme requires the use of a professional's name and license to either incorporate a new professional corporation, or in Dr. Fray's case, utilize her existing professional corporation, Defendant FRAY, to act as a vessel with which the Management Defendants can execute their fraudulent billing and treatment protocol.

51.     Upon being propositioned, Dr. Fray accepted the Management Defendants' terms and permitted the submission of thousands of bills for No-Fault reimbursement through the PC defendant in exchange for some form of renumeration.

52.     The Fraudulent Services rendered through FRAY are not performed at any fixed location, rather they are purportedly performed in a transitory manner at least twenty-six different multi-disciplinary No-Fault clinics.

53.     The clinics include, among others, the following locations:

- 1160 Midland Avenue, Bronxville, New York
- 141-41 Northern Boulevard, 2nd Floor, Flushing, New York
- 1500 Astor Avenue, Bronx, New York
- 2098 Rockaway Parkway, Brooklyn, New York
- 280 Broadway, Suite 2, Newburgh, New York
- 293 East 53rd Street, Brooklyn, New York
- 410 Saw Mill River Road, Suite 1025, Ardsley, New York

- 552 East 180th Street, Bronx, New York
- 764 Elmont Road, Elmont, New York
- 941 Burke Avenue, Bronx, New York
- 3910 Church Avenue, Brooklyn, New York
- 107-48 Guy R Brewer Boulevard, Jamaica, New York
- 132-35 41st Road, Suite 2D, Flushing, New York
- 2625 Atlantic Avenue, Brooklyn, New York
- 522 Lefferts Avenue, Brooklyn, New York
- 550 Remsen Avenue, Brooklyn, New York
- 5506 Avenue N, Brooklyn, New York
- 632 Utica Avenue, Brooklyn, New York
- 665 Pelham Parkway North, Suite 2D, Bronx, New York
- 800 St, Anne's Avenue, Suite 1, Bronx, New York
- 90-04 Merrick Boulevard, Jamaica, New York
- 97-01 101st Avenue, Jamaica, New York
- 1120 Morris Park Avenue, Suite B, Bronx, New York
- 227 East 105th Street, New York, New York
- 12 West 32nd Street, Second Floor, New York, New York
- 2184 Flatbush Avenue, Brooklyn, New York

54.     After multiple investigations, GEICO ultimately connected Defendants Dr. Fray and FRAY to the existing scheme led by the Management Defendants.

55.     GEICO's Special Investigative Unit initially began an investigation into the PC Defendant as the transitory services (Fraudulent Services) allegedly provided by FRAY that were billed to GEICO listed service locations which included clinics previously under investigation by GEICO for suspected insurance fraud.

56.     A closer review of the billing received by Defendant FRAY revealed that the Fraudulent Services were performed through the employ of multiple treating providers; namely Michael G. Alleyne, M.D., Elizabeth Kulesza, M.D., Jean Baptiste Simeon, M.D., Ivan Lam, M.D., Hadasah Orenstein, M.D., Lyudmila Pretskaya, M.D., Delys E. St Hill, M.D., Narcisse Versailles, M.D. and Jay Cohen, M.D.

57.     Several of the doctors allegedly employed by Defendant FRAY also provide the

same transient services for other professional corporations. The services allegedly provided include initial evaluations, re-evaluations and electrodiagnostic testing.

58.     GEICO's billing analysis further revealed that three of the PC Defendant's employees, Dr. Jean Baptiste Simeon, Dr. Ivan Lam and Dr. Hadasah Orenstein, are responsible for a bulk of the billing submitted. Dr. Simeon has consistently billed under professional corporations neither owned nor operated by him and he is the exclusive provider of service for Bennett Medical, P.C., a healthcare provider which was previously investigated by GEICO. Dr. Lam and Dr. Orenstein have worked for different providers on overlapping dates which include healthcare providers MGAL Medical Services, P.C., MAG Medical Diagnostic, P.C., MG Medical Care, P.C. and GALMAR Diagnostic Medical, P.C.

59.     Bennett Medical, P.C., MGAL Medical Services, P.C., MAG Medical Diagnostic, P.C., MG Medical Care, P.C. and GALMAR Diagnostic Medical, P.C. are all connected by Defendant Kotlyar, who has been identified as the layperson individual, among possible others, who exert complete control over the professional corporations. This was revealed after GEICO conducted the examinations under oath of Alla Tsimerman, M.D. and Aleksander Kolesnikov, M.D.

60.     Dr. Tsimerman is the purported owner of Bennett Medical, P.C. During the EUO of Bennett Medical, P.C., Dr. Tsimerman testified that she incorporated Bennett Medical, P.C. at the direction of a family friend, Defendant Kotlyar, who had suggested a business opportunity in electrodiagnostic testing. She further informed GEICO that she hired Defendant Kotlyar as a technician as well as his company, Defendant RAP services, who provides the equipment used for neurological testing and courier services which generally charge anywhere from $100.00 to $150.00 per printed report. Dr. Tsimerman also hired Dr. Simeon to perform neurological services

16

after Defendant Kotlyar made the introduction. Dr. Tsimerman's testimony further revealed she had minimal knowledge of her business' practice and that she permitted Defendant Kotlyar to sign blank checks on her behalf.

61.     During the examination under oath of Aleksander Kolesnikov, M.D., the purported owner of Alexander Kolensikov Medical P.C., Defendant Kotlyar and Defendant RAP Services were also identified and similar information was elicited through Dr. Kolesnikov's testimony.

62.     Defendant Kotylar was also identified during the investigation of MGAL Medical Services, P.C., MAG Medical Diagnostic, P.C., MG Medical Care, P.C. and GALMAR Diagnostic Medical, P.C. Each of these professional corporations are purportedly owned by Dr. Marina Galea and provide transient services. Through GEICO's verification requests, GEICO was provided a nerve conduction velocity certificate of attendance for Defendant Kotylar.

63.     Bills submitted to GEICO by Dr. Galea's professional corporations listed Dr. Orenstein and Dr. Lam as treating providers. Dr. Orenstein and Dr. Lam have purportedly provided services on overlapping dates which coincide with billing submitted by Defendants Dr. Fray and FRAY which listed Dr. Orenstein and Dr. Lam as the treating providers.

64.     In addition, GEICO discovered that Dr. Galea's professional corporations list service locations on their billing which include the same clinics which Defendant FRAY purportedly render its Fraudulent Services. These locations include, among others:

- 107-48 Guy R. Brewer Boulevard, Jamaica, New York
- 632 Utica Avenue, Brooklyn, New York
- 90-04 Merrick Boulevard, Jamaica, New York
- 665 Pelham Parkway, Bronx, New York
- 3910 Church Avenue, Brooklyn, New York
- 1120 Morris Park Avenue, Bronx, New York
- 2184 Flatlands Avenue, Brooklyn, New York
- 5506 Avenue N, Brooklyn, New York
- 1500 Astor Avenue, Suite 2B, Bronx, New York
- 550 Remsen Avenue, Brooklyn, New York

65.     Moreover, GEICO performed site inspections of the clinics located at (i) 1500 Astor Avenue, Bronx, New York; (ii) 764 Elmont Road, Elmont, New York; (iii) 941 Burke Avenue, Bronx, New York; and (iv) 280 Broadway, Newburgh, New York.   Employees at the clinics located at 1500 Astor Avenue and 764 Elmont Road were interviewed and were unable to verify the name of the professional corporation that provides neurological testing; however, they were familiar with the names of technicians and physicians who periodically appear.   Thus, while the names of the professional entities routinely change, the individuals in control remain the same. With regard to the other two clinics inspected, GEICO's investigators were met with resistance from the clinics' employees and were unable to obtain further information about the transient services provided.

66.     The findings of GEICO's investigation(s) conclude that Defendant Kotylar, as well John Does 1 through 20 and ABC Corporations 1 through 20, exert layperson control over Defendant FRAY, as well as the other professional corporations not named in this action.   That it is in fact these Management Defendants who direct the healthcare professionals and professional corporations participating in the scheme – such as Defendants Dr. Fray and FRAY- to which clinic they are scheduled to attend.   By having a pool of participating healthcare professionals and professional corporations readily available, the Management Defendants ensure coverage at each clinic or to every referring physician.

67.     The alleged employees of the PC Defendant are merely employees *on paper*. Rather, they obey the instruction and are managed by their true employer, the Management Defendants.

68.     While Defendant Dr. Fray has permitted use of her name, license and professional corporation in order to participate in the scheme, Defendants Kotylar, John Does 1 through 20 and

ABC Corporations 1 through 20 have unfettered control over the transient No-Fault practice of Defendant FRAY and are responsible for arrangements between it and the hub locations where the Fraudulent Services are purportedly performed.

69.     Dr. Fray retains limited control over Defendant FRAY and her ability to control only arises when she privately sees pediatric neurological patients.  However, the transient No Fault neurological services purportedly performed through Defendant FRAY is completely dictated by the Management Defendants and their fraudulent billing and treatment protocol.

70.     Defendants Kotylar, John Does 1 through 20 and ABC Corporations 1 through 20 associated themselves with the hub clinics and, in exchange for the payment of kickbacks, disguised as rent or other forms of remuneration, are able to supply the PC Defendant with a patient flow and referrals to whom it purportedly provides the Fraudulent Services.

71.     The payments from Defendants Kotylar, John Does 1 through 20 and ABC Corporations 1 through 20 to the Clinics allow the PC Defendant to have access to a steady stream of Insureds that could be subjected to the Fraudulent Services billed through Defendant FRAY.

72.     Defendant Dr. Fray has no genuine doctor-patient relationship with the Insureds that visit the Clinics.  The Insureds have no scheduled appointments with the PC Defendant, rather they are typically directed by staff members at the Clinics to subject themselves to the Fraudulent Services without regard to their actual need for the services or the exercise of any genuine medical judgment by Dr. Fray or her alleged staff.

73.     The Fraudulent Services billed by Defendant FRAY are medically unwarranted and falsely exaggerated the nature and degree of care.  The Fraudulent Services provided, to the extent they are provided at all, are performed pursuant to a fraudulent treatment protocol that

predesignates the same comprehensive level of testing to every Insured with the intention of maximizing profit rather than truly diagnosing any impairment or treating any injury.

### F.    The Fraudulent Billing and Treatment Protocol

74.    Several of GEICO's Insureds, who allegedly were injured in motor vehicle accidents and were purportedly evaluated and tested by Defendant FRAY, provided statements detailing the facts of the loss they were involved in and the medical services they received.

75.    The statements revealed that several of GEICO's Insureds did not innocently select the clinic where they sought treatment. GEICO discovered that in some instances, their Insureds sought treatment after staging a loss (Insureds "DC", "WL" and "EJB"). Also, that runners directed their Insured to their present clinic. GEICO's Insured "WL" indicated that the incident in which he was involved in was staged by the opposing vehicle, and that a runner approached him at the scene with a business card to the clinic. GEICO's Insured.

76.    Regardless of how GEICO's Insureds came to treat at their chosen clinic, they all were subjected to immeasurable amounts of medical testing and treatment from multi-disciplinary clinics that accept No-Fault insureds as patients prior to being introduced to Defendant FRAY.

77.    In fact, substantially all of FRAY's referrals originate from No-Fault multi-disciplinary clinics. Despite, the treatment and testing already provided to these insureds, the PC Defendant knowingly accepts referrals of patients who do not present symptoms or require a need for the diagnostic testing offered or the trigger point injections administered. Further, the services purportedly provided, to the extent they are provided at all, are not specifically tailored to a patient's unique set of circumstances but rather are predetermined and identical.

78.    The evidence unmistakably indicates the PC Defendant induced the Insureds to accept the Fraudulent Services, to the extent they were provided at all, which were not medically

necessary but pursuant to a pre-determined fraudulent billing protocol solely designed to financially enrich the Defendants, rather than to treat or benefit the Insureds.

79.     The testimony provided by the Plaintiffs' Insureds brought to surface that the charges received for patient examinations and electro diagnostic testing charged by the PC Defendant were fraudulent in that:

> i)      the levels of services were misrepresented and exaggerated to inflate charges in that the services were incompletely performed,
>
> ii)     the time spent was less than what was reported; and
>
> iii)    in several instances, the services were never provided at all.

80.     Plaintiffs' investigation further revealed that the Fraudulent Services are performed without prior consideration of a patient's history, physical examinations, symptomology or complaints of pain. Tests results are duplicated with minor changes added.

> i.      Patient Examinations

81.     Insureds are introduced to the Defendants' fraudulent billing and treatment protocol typically through an initial examination, or a charge for an initial examination, along with the preparation of medical records which indicate a predetermined diagnosis that suggests a need for either electrodiagnostic testing or trigger point injections.

82.     Defendant FRAY billed the Plaintiffs for initial examinations under Current Procedural Terminology ("CPT") codes 99203, 99204 and 99205.

83.     Under the applicable No-Fault Fee Schedule, these codes specifically state:

> **99203** Office or other outpatient visit for the evaluation and management of a new patient which requires these 3 key components: A detailed history; A detailed examination; Medical decision making of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate

severity.  Physicians typically spend 30 minutes face-to-face with the patient and/or family.

**99204** Office or other outpatient visit for the evaluation and management of a new patient which requires these 3 key components: A comprehensive history; A comprehensive examination; Medical decision making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity.  Physicians typically spend 45 minutes face-to-face with the patient and/or family.

**99205** Office or other outpatient visit for the evaluation and management of a new patient which requires these 3 key components: A comprehensive history; A comprehensive examination; Medical decision making of high complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity.  Physicians typically spend 60 minutes face-to-face with the patient and/or family.

84.    A comparison of the medical records and testimony obtained during GEICO's investigation into the billing received reveal a slew of misrepresentations concerning the severity of the patient's presenting problems, the time and/or extent of history taken, the extent of the exams and the level of medical decision making undertaken.

85.    Defendant FRAY routinely misrepresented the severity of its patients' injuries as moderate, moderate to high, or high in order to submit bills to the Plaintiffs using CPT codes 99203, 99204 and 99205 since payment pursuant to these codes yield a higher rate of reimbursement than codes that require presenting problems of low severity.

86.    According to the American Medical Association (AMA) CPT 2018 Professional, a presenting problem is a disease, condition, illness, injury, symptom, sign, finding, complaint or other reason for encounter, with or without a diagnosis being established at the time of the encounter. A presenting problem of moderate severity is described as a problem where the risk of morbidity without treatment is moderate; there is moderate risk of mortality without treatment;

uncertain prognosis, or increased probability of prolonged functional impairment. A presenting problem of high severity is described as a problem where the risk of morbidity without treatment is high to extreme; there is a moderate to high risk of mortality without treatment or high probability of severe, prolonged functional impairment.

87.     Appendix C of the AMA CPT 2018 Professional lists clinical examples of CPT codes 99203, 99204 and 99205 as guidance in proper use of these codes.

CPT code 99203

  i.  25-year old male with back pain of six weeks' duration (Neurology)

  ii.  Initial office visit for a 19-year old football player with three-day old acute knee injury; now swelling and pain. (Orthopedic Surgery)

CPT code 99204

  i.  Initial office visit for a 13-year old female with progressive scoliosis. (Orthopaedic Surgery)

  ii.  A healthy 8-year old male with attention problems in school. (Neurology)

CPT code 99205

  i.  Initial office visit for 60-year old male with previous back surgery; now presents with back and pelvic pain, two-month history of bilateral progressive calf and thigh tightness and weakness when walking, causing several falls. (Orthopaedic Surgery)

  ii.  57-year old with new-onset dementia. (Neurology)

88.     Medical records reveal that Defendant FRAY came to examine and treat Plaintiffs' Insureds subsequently after their involvement in automobile incidents which led to minor injuries, if any injuries were sustained at all. In virtually every case, the problems actually presented to the PC Defendant were the lowest in severity. Their circumstances are no way similar to problems

23

presented in the clinical examples illustrated by the AMA CPT 2018 Professional. It is evident that Defendant FRAY intentionally depicted presenting problems as much higher in severity for the purpose of legitimizing charges under CPT codes 99203, 99204 and 99205, and to falsely serve as a basis for future fraudulent services.

89.     Plaintiffs' investigation further revealed that neither the time spent, nor the extent of a patient's history was accurately represented by Defendant FRAY's charges under CPT codes 99203, 99204 and 99205.

90.     The aforementioned CPT codes, typically require a physician spend between thirty to sixty minutes face-to-face with a patient or a patient's family and that a detailed or comprehensive history and examination is performed.

91.     The extent of the history is dependent upon clinical judgment and on the nature of the presenting problem(s).

92.     According to the AMA CPT 2018 Professional, a detailed history and comprehensive history is defined as follows:

> ***Detailed***: Chief complaint; extended history of present illness; problem pertinent system review extended to include a review of a limited number of additional systems; **pertinent** past, family, and/or social history **directly related to the patient's problems.**
>
> ***Comprehensive:*** Chief complaint; extended history of present illness; review of systems that is directly related to the problem(s) identified in the history of the present illness plus a review of all additional body systems; **complete** past, family, and social history.
>
> [Emphasis added]

93.     Several of Plaintiffs' Insureds repeatedly described their initial evaluations as short in duration with minimal inquiry of their past, family, and/or social history. For example, Plaintiffs' Insured "HA" stated the initial evaluation was considerably short, approximately ten

minutes; however, Defendant FRAY submitted a bill for an initial examination charged under CPT code 99204, representing that a forty-five minute examination took place. Plaintiffs' Insured "SW" indicated his initial examination with Defendant FRAY was fifteen minutes in duration; however, a bill was submitted by the Defendant using CPT code 99204 as well.

94.     In keeping with the fact that the evaluations were brief, the Defendants also used template forms to conduct a brief interview. Template forms restrict the physician to the questions posed on the form and do not allow for inquiry.

95.     Therefore, Defendant FRAY's charges for initial evaluations misrepresented the extent of the history taken and length of time spent with the patient.

96.     Similarly, the extent of the initial examinations purportedly conducted by Defendant FRAY can neither be regarded as detailed, nor comprehensive, which are required under CPT codes 99203, 99204 and 99205.

97.     AMA's CPT 2018 Professional defines a detailed examination and comprehensive examination as the following:

> *Detailed*: An extended examination of the affected body area(s) and other symptomatic or related organ system(s).
>
> *Comprehensive*: A general multisystem or a complete examination of a single organ system.

98.     With respect to the examinations performed, the PC Defendant merely documented vital signs, basic range of motion, muscle strength and conducted a quick examination that in total was completed within minutes.

99.     In some instances, no actual physical examination of the patient's body occurred. It was reported to GEICO by Insureds "SMM", "LW", "AJ", "AS" and "VC" that no actual physical examination took place; however, the Defendants submitted charges to the Plaintiffs

25

representing that examinations were performed which reimbursement was sought under CPT code 99204.

100. Despite the foregoing, Defendant FRAY routinely submitted charges to the Plaintiffs for initial examinations utilizing CPT codes 99203, 99204 and 99205 claiming they undertook "detailed" and "comprehensive" physical examinations. Corresponding medical reports and the testimony of Plaintiffs' Insureds indicate that the physical examinations which were purportedly conducted were not extended and did not include multiple organ systems.

101. Plaintiffs' investigation revealed the initial examinations involved only straightforward medical decision making. CPT codes 99203, 99204 and 99205 require medical decision making that is either low, moderate or high in complexity.

102. Low complexity medical decision making requires a limited number of diagnoses or management options, a limited amount and/or complexity of data to be reviewed and a low risk of complications and/or morbidity or mortality. Moderate complexity medical decision making requires a multiple number of diagnoses or management options, a moderate amount and/or complexity of data to be reviewed and a moderate risk of complications and/or morbidity or mortality. High complexity medical decision making requires an extensive number of diagnoses or management options, an extensive amount and/or complexity of data to be reviewed and a high risk of complications and/or morbidity or mortality

103. Defendant FRAY did not retrieve, review or analyze any medical record, diagnostic test or other information in conjunction with the examination. Patients presented no risk of significant complications, morbidity or mortality, and were not prescribed any diagnostic or treatment procedure that could incur any risk of significant complications, morbidity or mortality.

Furthermore, the PC Defendant did not consider varying diagnoses or treatment plans for their patients as the abided by a fraudulent billing and treatment protocol.

104.    If any of Plaintiffs' Insureds were exposed to any risk, said risks would have been overlooked due to the inadequate manner in which Defendant FRAY conducted its examinations.

105.    Thus, charges for initial examinations submitted by Defendant FRAY to GEICO for reimbursement contained dishonest representations regarding the level of services performed, if performed at all, and were billed pursuant to a fraudulent billing and treatment protocol and in contravention of all relevant laws and regulations governing healthcare practice in New York.

        ii.    Follow Up Examinations

106.    Pursuant to the fraudulent billing and treatment protocol, Defendant FRAY purportedly performed follow up examinations during the course of an Insured's treatment. The follow up examinations performed, to the extent they were performed, served to substantiate the prescription of testing or other procedures.

107.    The follow up examinations were charged to GEICO using CPT codes 99212, 99213, 99214 and 99215.

108.    Under the No Fault fee schedule, these codes are described as follows:

> **99212** Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three components: A problem focused history; A problem focused examination; Straightforward medical decision making. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are self-limited or minor. Physicians typically spend 10 minutes face-to-face with the patient and/or family.

> **99213** Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three components: An expanded problem focused history; An expanded problem focused examination; Medical decision making of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the

problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of low to moderate severity. Physicians typically spend 15 minutes face-to-face with the patient and/or family.

**99214** Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three components: A detailed history; A detailed examination; Medical decision making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Physicians typically spend 25 minutes face-to-face with the patient and/or family.

**99215** Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three components: A comprehensive history; A comprehensive examination; Medical decision making of high complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Physicians typically spend 40 minutes face-to-face with the patient and/or family.

109. A comparison of the medical records and testimony obtained during GEICO's investigation to the billing received reveal a slew of misrepresentations concerning the severity of the patient's presenting problems, the time and/or extent of history taken, the extent of the exams and the level of medical decision making undertaken.

110. The PC Defendant routinely misrepresented the severity of its patients' injuries as low to moderate, or moderate to high (where no actual injury exists), in order to submit bills to the Plaintiffs using CPT codes 99212, 99213, 99214 and 99215 as payment pursuant to these codes yield a higher rate of reimbursement than codes that require patients present problems of the lowest severity.

111. The AMA CPT 2018 Professional offers a definition for each degree of presenting problems listed under CPT codes 99212, 99213, 99214 and 99215. A presenting problem of self-limited or minor severity is described as a problem that runs a definite and prescribed course, is

transient in nature, an is not likely to permanently alter health status or has a good prognosis with management/compliance. A presenting problem of low severity is described as a problem where the risk of morbidity without treatment is low; there is little to no risk of mortality without treatment; full recovery without functional impairment is expected. A presenting problem of moderate severity is described as a problem where the risk of morbidity without treatment is moderate; there is moderate risk of mortality without treatment; uncertain prognosis, or increased probability of prolonged functional impairment. Lastly, a presenting problem of high severity is a problem where the risk of morbidity without treatment is high to extreme; there is moderate to high risk of mortality without treatment, or high probability of severe, prolonged functional impairment.

112.    Appendix C of the AMA CPT 2018 Professional lists clinical examples of CPT codes 99212, 99213, 99214 and 99215 as guidance in proper use of these codes.

CPT code 99212

    i.    Office visit for a 23-year-old healthy female fully recovered from Bell's palsy, seen one week after onset and initial visit. (Neurology)

    ii.    Office visit for 66-year-old with sebaceous cyst on shoulder. (General Surgery)

CPT code 99213

    i.    Office visit for the quarterly follow-up of a 63-year-old male, established patient, with chronic myofascial pain syndrome, effectively managed by doxepin, who presents with new onset urinary hesitancy. (Pain Medicine)

    ii.    Office visit for a 43-year-old male, established patient, with known reflex sympathetic dystrophy. (Anesthesiology)

CPT code 99214

    i.    Office visit for a 55-year-old male, established patient, with increasing night pain, limp, and progressive varus of both knees. (Orthopaedic Surgery)

    ii.    Office visit for a 45-year-old male, established patient, four months follow-up of L4-5 discectomy, with persistent incapacitating low back and leg pain. (Orthopaedic Surgery)

CPT code 99215

    i.    Office visit for a 68-year-old male with biopsy-proven rectal carcinoma, for evaluation and discussion of treatment options. (General Surgery)

    ii.    Office visit for a 36-year-old, established patient, three-month status post-transplant, with new onset of peripheral edema, increased blood pressure, and progressive fatigue. (Nephrology)

113.    Almost every problem Defendant FRAY's patients presented, if any was presented at all, was of the lowest severity, and generally involved soft tissue sprains and strains. The problems presented in the clinical examples illustrated by the AMA CPT 2018 Professional cannot compare to any problem presented to Defendant FRAY.  It is clear that Defendant FRAY fabricated the severity of its patients' presenting problems in order to charge under CPT codes 99212, 99213, 99214 and 99215, and to legitimatize the necessity of future testing or other fraudulent services.

114.    Plaintiffs' investigation further revealed that neither the time spent, nor the extent of a patient's history was accurately represented by Defendant FRAY's charges under CPT codes 99212, 99213, 99214 and 99215.

115.    The aforementioned CPT codes, typically require a physician spend between 10 to 40 minutes face-to-face with a patient or a patient's family and a problem focused, expanded problem focused, detailed or comprehensive history be performed.

116.    The extent of the history is dependent upon clinical judgment and on the nature of the presenting problem(s).

117.    According to the AMA CPT 2018 Professional, a problem focused, expanded problem focused, detailed or comprehensive history is defined as follows:

> ***Problem focused:*** Chief complaint; brief history of present illness or problem.
>
> ***Expanded problem focused***: Chief complaint; brief history of present illness; problem pertinent system review.
>
> ***Detailed***:  Chief complaint; extended history of present illness; problem pertinent system review extended to include a review of a limited number of additional systems; **pertinent** past, family, and/or social history **directly related to the patient's problems.**
>
> ***Comprehensive:*** Chief complaint; extended history of present illness; review of systems that is directly related to the problem(s) identified in the history of the present illness plus a review of all additional body systems; **complete** past, family, and social history.
>
> [Emphasis added]

118.    The follow up evaluations performed, to the extent they were performed at all, were completed swiftly and involved the use of template forms to conduct a brief interview.

119.    Therefore, Defendant FRAY's charges for follow up evaluations misrepresented the extent of the history taken and length of time spent with the patient.

120.    Likewise, the extent of the follow up evaluations purportedly conducted by Defendant FRAY can neither be regarded as problem focused, expanded problem focused, detailed or comprehensive, which CPT codes 99212, 99213, 99214 and 99215 require.

121.    AMA's CPT 2018 Professional defines a problem focused, expanded problem focused, detailed or comprehensive examination as the following:

> ***Problem focused:***  A limited examination of the affected body area or organ system.

*Expanded problem focused:* A limited examination of the affected body area or organ system and other symptomatic or related organ system(s).

*Detailed*: An extended examination of the affected body area(s) and other symptomatic or related organ system(s).

*Comprehensive*: A general multisystem or a complete examination of a single organ system.

122.    With respect to the examinations performed, to the extent they were performed at all, Defendant FRAY merely documented vital signs, basic range of motion and muscle strength, undertook a general neurological evaluation and conducted a quick examination that in total was completed under ten minutes.

123.    Despite the foregoing, Defendant FRAY routinely submitted charges to the Plaintiffs for follow up examinations utilizing CPT codes 99212, 99213, 99214 and 99215 claiming they undertook "problem focused", "expanded problem focused", "detailed" and "comprehensive" physical examinations. Corresponding medical reports and the testimony of Plaintiffs' Insureds indicate that the physical examinations which were purportedly conducted were not as extensive as claimed.

124.    Plaintiffs' investigation revealed the follow up examinations did not involve any medical decision making as the resulting testing, treatment and other procedures prescribed were predetermined and pursuant to the fraudulent billing and treatment protocol. CPT codes 99212, 99213, 99214 and 99215 require medical decision making that is either straightforward, low, moderate or high in complexity.

125.    Straightforward medical decision making requires a minimal number of diagnoses or management options, a minimal amount and/or complexity of data to be reviewed and minimal risk of complications and/or morbidity or mortality.   Low complexity medical decision making requires a limited number of diagnoses or management options, a limited amount and/or

32

complexity of data to be reviewed and low risk of complications and/or morbidity or mortality. Moderate complexity medical decision making requires a multiple number of diagnoses or management options, a moderate amount and/or complexity of data to be reviewed and moderate risk of complications and/or morbidity or mortality. High complexity medical decision making requires an extensive number of diagnoses or management options, an extensive amount and/or complexity of data to be reviewed and high risk of complications and/or morbidity or mortality.

126. The PC Defendant did not retrieve, review or analyze any medical record, diagnostic test or other information in conjunction with the examination. Patients presented no risk of significant complications, morbidity or mortality, and were not prescribed any diagnostic or treatment procedure that could incur any risk of significant complications, morbidity or mortality.

127. In addition, any risk entailed would have been overlooked due to the inadequate manner in which Defendant FRAY conducted the examinations.

128. In sum, the charges for follow up examinations submitted by Defendant FRAY for reimbursement contained multiple misrepresentations regarding the level of services performed, to the extent they were performed at all. The follow up examinations were billed pursuant to a fraudulent billing and treatment protocol and in contravention of all relevant laws and regulations governing healthcare practice in New York.

### iii. Electrodiagnostic Testing

129. Defendant FRAY charged the Plaintiffs for various electrodiagnostic tests, such as nerve conduction velocity (NCV) tests and electromyography (EMG) tests, allegedly used to diagnose radiculopathies suffered by their patients.

130.    Radiculopathy is dysfunction or malfunction of a spinal nerve root which can be caused by compression. While the nerve root is the source of the injury, the pain radiates out to the part of the body served by that nerve root and can be associated with numbness, tingling, weakness and reflex loss along the course of the nerve root.

131.    Causes of radiculopathy include: mechanical compression of the nerve root by a disc herniation, bone spur or thickening of surrounding ligaments; a tumor; scoliosis; diabetic ischemia, infection, or inflammation. Acute trauma from a car accident can infrequently lead to damage to the discs, muscles and ligaments as well as to the nerves travelling throughout the spine and body from the neck or the lower back or to the arms and legs.

132.    The diagnosis of radiculopathy begins with a neurological history and examination to evaluate the patient's muscle strength, sensation and reflexes to find the focal abnormalities. A patient may be sent for an X-ray or CT scan to identify the presence of trauma, osteoarthritis, tumor or infection. An MRI scan may be necessary to provide a better look at the soft tissues around the spine including the nerves, the discs and ligaments. Specialized nerve tests like NCVs and EMGs are designed to confirm the diagnosis of any abnormality in the functioning of the spinal nerve roots.

133.    Within the human body there are 31 pairs of spinal nerves which are identified according to where they leave the spinal column. There are eight pairs of cervical nerves, twelve pairs of thoracic nerves, five pairs of lumbar nerves, five pairs of sacral nerves and one pair of coccygeal nerve roots. Peripheral nerves consist of sensory and motor nerve fibers. Sensory nerves and fibers collect and carry sensory information from the skin and joints to the brain while motor nerves transmit signals from the brain to the nerves to initiate muscle activity.

34

*1)*     *NCVs*

134.    A NCV test provides information about abnormal conditions in the peripheral nerves. Peripheral nerves are stimulated with electrical impulses by a pair of electrodes while recording electrodes detect the transmitted electrical impulse "down-stream" from the stimulator.

135.    The test has four components: (i) motor, (ii) sensory, (iii) F-wave study and (iv) H-reflex study.  There are both motor and sensory peripheral nerves, containing motor and sensory nerve fibers, in the limbs that can be tested through a NCV.  F-wave and H-reflex studies track the time it takes for an impulse to travel from a stimulus site in a limb to the spinal cord and back to the recording electrode.

136.    The same machine is used for both EMGs and NCVs.  In recording a NCV, the machine records the timing of a nerve response to stimulation (the "latency"), the magnitude of the response (the "amplitude") and the speed at which the nerve conducts the impulse over a measured distance (the "conduction velocity").  It presents a graphic representation of the changes in amplitude which forms the action potential in wave form.  Reference values are used to define the limits of normal function and are compared with test values to determine if they are outside the range which would suggest the presence of some form of neuropathy.

137.    Each patient requires a unique NCV, meaning their history, physical examination and real time results will determine which sensory fibers, motor fibers or both in any such peripheral nerve should be tested.  Therefore, the number of peripheral nerves and type of fibers tested should vary from patient to patient.

138.    The PC Defendant billed for NCVs using CPT codes 95900, 95903, 95904 and 95934. A description of the codes reads as follows:

> **95900** Nerve conduction, amplitude and latency/velocity study, each nerve; motor, without F-wave study

**95903** Nerve conduction, amplitude and latency/velocity study, each nerve; motor with F-wave study

**95904** Nerve conduction, amplitude and latency/velocity study, each nerve; sensory

**95934** H-reflex, amplitude and latency study; record gastrocnemius/soleus muscle

139.    In most instances, the Defendant's patients did not report symptoms of radiculopathies or neuropathies. GEICO's Insureds, "SMM", "EG", "TKE", "SW", "AJ", "MW" and "AS" denied experiencing any symptoms which would have warranted electrodiagnostic testing.    Therefore, NCVs were unnecessarily ordered pursuant to the fraudulent billing and treatment protocol.

140.    The manner in which the tests were performed, if performed at all, were further incomplete in that the PC Defendant's patients (Plaintiffs' Insureds "TP", "TM", "SMM", "LM" and "SWB") indicated no measurements were taken during the performance of the electrodiagnostic tests.

141.    If any of Defendant's patients did present complaints or findings associated with radiculopathy, *i.e.* radicular numbness, tingling, burning and/or weakness of the arms and/or legs, the tests performed were nevertheless improper because the Defendant did not tailor the NCV tests to their patient's unique set of circumstances.    Instead, FRAY utilized the same sequence of peripheral nerves and nerve fibers repeatedly for patient after patient.

142.    Further, the Defendant routinely tested far more nerves than what is deemed recommended policy thereby inexcusably subjecting their patients to painful and needless testing.

143.    The American Association of Neuromuscular & Electrodiagnostic Medicine's ("AANEM") offers a "Maximum Number of Studies Table" which is a chart defining the medical standard of the maximum amount of testing necessary for a physician to arrive at a diagnosis which

36

is applicable in 90% percent of cases. Its purpose is to assist in distinguishing appropriate charges from those that are abusive. To the extent NCV testing was actually performed, the manner in which the Defendant employed NCV tests offends the standard set by AANEM.

> 2)    EMGs

144.    An EMG evaluates and records electrical activity produced by muscles, focusing on their nerve supply; *i.e.* spinal nerve roots and peripheral nerves. It is a test which involves inserting a needle electrode through the skin into the muscle that is being studied. EMGs, unlike NCVs, track denervation and reinnervation of the axon. An EMG maps each muscle's activity during insertion, at rest and during muscle contraction. The results are obtained in real time, and may be recorded in audio and video.

145.    The PC Defendant billed for EMGs using CPT code 95864, 95866, 95885, 95886. The Fee Schedule specifies what this code represents:

> **95864** Needle electromyography; 4 extremities with or without related paraspinal areas
>
> **95866** Needle electromyography; hemidiaphragm
>
> **95885** Needle electromyography, each extremity, with related paraspinal muscles, when performed, done with nerve conduction, amplitude and latency/velocity study; limited (list separately in addition to code for primary procedure)
>
> **95886** Needle electromyography, each extremity, with related paraspinal muscles, when performed, done with nerve conduction, amplitude and latency/velocity study; complete, five or more muscles studied, innervated by three or more nerves or four or more spinal levels (list separately in addition to code for primary procedure)

146.    Based on GEICO's investigation, Defendant FRAY's patients did not report symptoms of radiculopathies and examinations were not adequate for suspected radiculopathy. Therefore, the EMGs purportedly conducted were done pursuant to the fraudulent billing protocol alone and for no other valid reason.

147.    If any of the PC Defendant's patients did present neurological symptoms, the EMGs performed were medically useless since the tests were not customized to a patient's unique set of circumstances.  The same muscles, routinely four or more, in the same limbs were purportedly evaluated in every EMG charged to the Plaintiffs.  Thus, unreliable test results were of no use to any referring physician or patient.

148.    Further, the manner in which the Defendant FRAY performed the EMGs defies acceptable practice.  Within the medical community, two limbs are sufficient to diagnose radiculopathy in ninety percent of cases.  The Defendant predominantly tested all four limbs which the AANEM deems excessive.  For example, GEICO received billing for four-limb EMGs performed upon GEICO's Insureds "EA", "TW", "SMM". "EG". "TKE", "SW", "LW", "SM", "KW", "AJ", "MW", "AS", "TP", "FR", "DS", "HA" and "VC", as well as hundreds of others.

149.    Both NCVs and EMGs performed by the PC Defendant, to the extent they were performed at all, were not performed in a manner that is consistent with common medical practice.

150.    Several of Plaintiffs' Insureds ("CR2", "HB", "VC" and "DS") were unaware of the reason why nerve testing was ordered and often it was the receptionist or office manager who informed them that they were scheduled for electrodiagnostic testing that same day.  As Defendant's patients were provided a few minutes notice prior to the tests, they were not permitted adequate time for preparation. GEICO's Insured "SW" stated no explanation of the test was provided before it was performed.

151.    The reliability of the data obtained from the neurological tests performed are questionable as GEICO's Insureds "CS", "AE", "RC", "JES", "TP", "KJ" and "HWL" indicated that both the physical examinations, if performed at all, along with the performance of the tests combined took less than twenty minutes to complete.

152.    Due to the inadequate data reported, the diagnoses themselves were inaccurate and of no use.

153.    In several instances, the testing, to the extent any tests were performed at all, was performed in an incomplete and incorrect manner wherein a needle may not have been inserted into the muscle. GEICO's Insured "SEM" and "TJ" indicated that the needle inserted merely breached the skin and was not inserted deep into the muscle. Another GEICO Insured, "SMM", stated a neurological test involving a needle was performed but that there were no wires or patches used. Insured "EG" stated one needle was inserted into her arm during the EMG; however, GEICO received a bill for a four-limb EMG.

154.    Further, the results of electrodiagnostic tests allegedly performed were rarely provided to the patient and did not impact the patient's treatment plan. Insureds "TYW", "CR", "CR2", "AJ", "FR", "SMM", "LW", "KJ", "HWL", "AJ", "FR", "CS", "SWB", "VC" and "DS" were never provided test results and/or their treatment remained the same. The electrodiagnostic tests performed, to the extent they were performed, provided no diagnostic benefit that could be used to reshape a patient's treatment plan.

155.    In some instances, EMGs billed by the PC Defendant were never in fact performed. GEICO's Insured "LW" indicated that she stopped the EMG after one insertion was attempted; however, GEICO received a bill for the performance of a four-limb EMG. Insured "TW" stopped the EMG at the onset as the pain was intolerable. While Insureds "EA", "HA", "CA", "SW" and "VC" flat out denied receiving any neurological testing that involved the use of a needle.

156.    Lastly, billing received from Defendant FRAY contained other misrepresentations which raises concerns as to who was performing the Fraudulent Services and whether the individual was properly licensed and certified to perform electrodiagnostic testing. For instance,

both GEICO Insureds, "SMM" and "EA" indicated a female performed the services received; however, billing submitted by Defendant FRAY indicates Jean Baptiste Simeon, M.D. (male) as the treating provider.

### G.      The Defendants' Fraudulent Concealment and Plaintiffs' Justifiable Reliance

157.   The Defendants have submitted, or caused to submitted, a voluminous number of NF-3, HCFA-1500 forms, and supporting documentation to the Plaintiffs seeking payment for Fraudulent Services they knowingly knew they were not entitled to receive.

158.   The NF-3, HCFA-1500 forms, and supporting documentation submitted to the Plaintiffs contained material misrepresentations claiming the fraudulent services were medically necessary when they were provided, to the extent they were provided at all, pursuant to a fraudulent billing and treatment protocol.

159.   The NF-3, HCFA-1500 forms, and supporting documentation submitted to the Plaintiffs contained misrepresentations exaggerating the level and nature of the fraudulent services performed, to the extent they were performed at all, as the fraudulent services were rendered pursuant to a fraudulent billing and treatment protocol.

160.   The Defendants disregarded legal and ethical obligations by submitting, or causing to be submitted, billing that they knew contained material misrepresentations.

161.   In order to compel the Plaintiffs to pay for the fraudulent services charged, the Defendants took concerted efforts to conceal their illicit operation. To prevent the Plaintiffs from detecting that the fraudulent services were rendered pursuant to a billing and treatment protocol, the Defendants intentionally misrepresented and concealed facts that would have exposed themselves.

40

162. The Defendants knew the Plaintiffs properly engage in business and follow the No-Fault claim procedures which were designed to promote swift and fair resolution of claims. Thereby hoping the Plaintiffs would not be able to detect their fraudulent submissions before the expiration of time to pay or deny claims.

163. While the Plaintiffs grew suspicious of the PC Defendant's billing, they continued throughout the course of their investigation to abide by claim procedures set forth in the No-Fault regulations concerning the issuance of No-Fault denials and requests for additional verification.

164. As a result, the Plaintiffs either: (i) timely paid claims; (ii) timely and appropriately denied claims for No-Fault benefits submitted by the PC Defendant; or (iii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault benefits submitted by the PC Defendant, and, therefore the Plaintiffs' time to pay or deny claims has not yet expired.

165. The Plaintiffs are statutorily and contractually obligated to swiftly and fairly process claims within thirty days upon receipt. The NF-3, HCFA-1500 forms, and supporting documentation submitted to the Plaintiffs, containing the material misrepresentations described above, were submitted to induce payment by the Plaintiffs who were led to justifiably rely on them causing Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company to incur more than Two Hundred Forty-One Thousand Eight Hundred Dollars and Nineteen Cents ($241,800.19) in damages.

166. The Plaintiffs undertook a long investigation which comprised of collecting all fraudulent billing and medical reports for inspection and comparison, interviewing Insureds, conducting on-site inspections of the various hub facilities, and database searches.

167. As the investigation only recently concluded, the Plaintiffs were unable to minimize their damages until the results of the investigation were available. This complaint was filed

immediately after it was determined that the services rendered were fraudulent and in violation of New York Law and public policy.

### H.    FRAY Breached a Condition Precedent to Coverage and is not Eligible to Receive No-Fault Reimbursements by Failing to Appear for an EUO

168.    By refusing and failing to appear for an EUO, Defendant FRAY breached a condition precedent to coverage – the failure to meet this condition precedent to coverage leaves the Defendant ineligible to receive No-Fault reimbursements.

169.    The No-Fault Regulation contains explicit language in 11 NYCRR 65-1.1 that there shall be no liability on the part of the No-Fault insurer if there has not been full compliance with all conditions precedent to coverage.  Specifically, 11 NYCRR 65-1.1 states:

> No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage.

170.    One such condition contained within the Regulation is the appearance of the Defendant at an EUO.

171.    The Regulation mandates at 11 NYCRR 65-1.1 that:

> Upon request by the Company, the eligible injured person or that person's assignee or representative shall:
>
> (a) execute a written proof of claim under oath;
>
> (b) as may reasonably be required submit to examinations under oath by any person named by the Company and subscribe the same;
>
> (c) provide authorization that will enable the Company to obtain medical records; and
>
> (d) provide any other pertinent information that may assist the Company in determining the amount due and payable.

172.    The failure of the Defendant to appear at an EUO renders the Defendant ineligible

to receive No-Fault reimbursements from GEICO for any treatment that was rendered by the Defendant for the claims in which the EUO of the Defendant was sought and the Defendant failed to appear.

173. The Appellate Term of the Supreme Court held in <u>W&Z Acupuncture, P.C. v. Amex Assurance Company</u>, 901 N.Y.S.2d 903 (N.Y. App. Term 2d. Dep't 2009) that the appearance of a medical provider at an examination under oath is a condition precedent to coverage. Specifically, the Court held that the "appearance of the eligible injured person's assignee at an EUO is a condition precedent to the insurer's liability on the policy." <u>See also,</u> <u>Fogel v. Progressive</u>, 35 A.D.3d 720 (N.Y. App. Div. 2d Dep't 2006).

174. Moreover, as cited by the Appellate Term in <u>W&Z</u>, the No-Fault Regulation itself places an unconditional obligation on the Defendant to appear for an examination under oath. The No-Fault Regulation requires the Defendant to appear for an examination under oath as demanded by GEICO. The Defendant's refusal and failure to appear for an EUO is a violation of the No-Fault Regulation.

175. The Appellate Division, First Department, held that where there is a failure to comply with a condition precedent to coverage, an insurer has "the right to deny all claims retroactively to the date of loss, regardless of whether the denials were timely issued. <u>Unitrin</u>, 82 A.D.3d 559.

176. Based upon the Defendant's breach of a condition precedent to coverage by failing to appear for an EUO, GEICO is under no obligation to honor or pay for the claims in which the EUO of the Defendant was sought and the Defendant failed to appear. A chart detailing by claim number the receipt of the bill, the issuance of verification requests, the scheduling of the examinations under oath and the timely denial of the claim is attached hereto as **Exhibit "2"**.

## V.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Declaratory Judgment -28 U.S.C. §§2201 and 2202)
### (Fraudulent Treatment Protocol)

177.   Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 176 above.

178.   There is an actual case in controversy between GEICO and the Defendants regarding more than Two Million Two Hundred Sixty-Five Thousand Two Hundred and Five Dollars and Twenty-Nine Cents ($2,265,205.29) in billing submitted and Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company with a total amount of damages incurred of Two Hundred Forty-One Thousand Eight Hundred Dollars and Nineteen Cents ($241,800.19).

179.   Defendant FRAY has no right to receive payment for any pending bills submitted to Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company because the Fraudulent Services were not medically necessary and were provided, the extent they were provided at all, pursuant to a pre-determined protocol that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

180.   Defendant FRAY has no right to receive payment for any pending bills submitted to Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services and/or supplies that purportedly were provided in order to inflate the charges submitted to Government Employees

44

Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company.

181.     Defendant FRAY has no right to receive payment for any pending bills submitted to Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company because the fraudulent, pre-determined treatment and billing protocol was subject to the direction and control of persons not licensed to practice medicine, resulting in the performance and billing for unnecessary and inflated charges to Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company.

182.     Accordingly, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendant FRAY has no right to receive payment for any pending bills submitted to Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company.

## SECOND CAUSE OF ACTION
### (Common Law Fraud)

183.     Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 182 above.

184.     The Defendants knowingly made false and fraudulent statements of material fact to Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company and concealed material facts from Government Employees Insurance Company, GEICO Indemnity Company, GEICO General

45

Insurance Company and GEICO Casualty Company in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

185.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed services were medically necessary, when in fact the billed services were not medically necessary and were performed pursuant to a pre-determined protocol that was subject to the direction and control by unlicensed persons which enriched Defendants; (ii) in every claim, the representation that the billing appropriately reflected the level of services performed, when in fact the billing codes used for the Fraudulent Services and the manner in which the services were described misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company.

186.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company to pay charges submitted through FRAY and under Dr. Fray's name that were not compensable under the No-Fault laws.

187.    Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company have been injured in its business and property by reason of the above-described conduct in that it has paid at least Two Hundred Forty-One Thousand Eight Hundred Dollars and Nineteen Cents ($241,800.19) pursuant to the fraudulent bills submitted by the Defendants through FRAY and under Dr. Fray's name.

188.     Accordingly, by virtue of the foregoing, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are entitled to compensatory damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment)

189.     Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 188 above.

190.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.

191.     When Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. paid the bills and charges submitted by or on behalf of Defendant FRAY for No-Fault benefits, they reasonably believed that they were legally obligated to make such payments based on the Defendants' improper, unlawful and/or unjust acts.

192.     The Defendants have been enriched at by payment from Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co., which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

193.     Defendants' retention of payments from Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. violates fundamental principles of justice, equity and good conscience.

194.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than Two Hundred Forty-One Thousand Eight Hundred Dollars and Nineteen Cents ($241,800.19).

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment-28 U.S.C. §§2201 and 2202)
### (Violation of the Business Corporation Law, Education Law and Regulation 68)

195.    Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 194 above.

196.    The Defendants are jointly and severally liable for the acts and omissions set forth in this Complaint.

197.    The Plaintiffs investigation into this matter determined that Defendant Dr. Fray, unlawfully allowed her professional license to be utilized by unlicensed laypersons and nonprofessional corporations, Defendants Kotylar, John Does 1 through 20 and ABC Corporations 1 through 20, in the operation and control of Defendant FRAY.

198.    The actions taken by the Defendants Kotylar, John Does 1 through 20 and ABC Corporations 1 through 20, including Defendant RAP Services, in controlling the professional corporation in the name of Defendant FRAY for the purposes of submitting No-Fault bills are contrary to public policy, the No-Fault Regulation and the rule of law of the State of New York.

199.    Plaintiffs have no obligation to pay for healthcare services allegedly rendered by healthcare providers acting in the employ of a professional corporation, where, as here, the professional corporation is being exploited by laypersons to facilitate fraudulent billing and/or submitted claims that are fraudulent in nature.

200.    The Defendants Dr. Fray, Kotylar, John Does 1 through 20 and ABC Corporations

48

1 through 20, Rap Services and FRAY intentionally, knowingly, fraudulently and with an intent to deceive the Plaintiffs and the public, omitted material facts and made material misrepresentations as to the following:

    i.    intending to hold out the professional corporation as legal and lawfully operating professional corporate entity, when it was not; and

    ii.    intending to fraudulently induce the Plaintiffs to make payments to the PC Defendant for claims and bills that the Defendants were/are not legally entitled to receive.

    201.    Defendants Dr. Fray, Kotylar, John Does 1 through 20 and ABC Corporations 1 through 20, Rap Services and FRAY intentionally, knowingly, fraudulently and with an intent to deceive the Plaintiffs, the public and patients of Defendant FRAY, concealed the fact that unlicensed persons were managing and controlling the PC Defendant by making false representations of material facts, including, but not limited to:

    i.    falsely setting forth the name of FRAY, as a professional corporation controlled by a licensed healthcare professional in No-Fault bills and reports intended to deceive and mislead the Plaintiffs into believing that FRAY was a legal professional corporation;

    ii.    providing false and misleading statements and information regarding who controlled and operated Defendant FRAY;

    iii.    providing false and misleading statements and information intended to mislead the Plaintiffs into believing that Defendant FRAY was being operated by the licensed professional-shareholder(s) indicated in their respective certificates of incorporation;

    iv.    providing false and misleading statements and information intended to circumvent the laws of the State of New York that prohibit ownership and/or control by individuals not licensed to practice the profession;

    v.    providing false and misleading statements and information in the signed medical reports and claim submissions intended to deceive and conceal the fact that Defendant FRAY was illegally engaged in the corporate practice of medicine and unlawful fee-splitting; and

49

vi.     providing false and misleading statements and information in the signed medical reports and claim submissions intended to deceive and conceal the fact that Defendants Dr. Fray and FRAY were illegally permitting an unlicensed person to make healthcare decisions.

202.     That based upon Defendants Dr. Fray, Kotylar, John Does 1 through 20 and ABC Corporations 1 through 20, Rap Services and FRAY's fraudulent actions in the control of Defendants Dr. Fray and FRAY, and based upon the violations of the Business Corporation Law, Education Law and Regulation 68, the Plaintiffs should be not be required or obligated to pay any monies, funds or No-Fault reimbursements to Defendant FRAY.

203.     The Plaintiffs seek a declaratory judgment that Defendant FRAY is/was fraudulently controlled by laypersons, in violation of the Business Corporation Law, the Limited Liability Company Law, the Education Law and Regulation 68 and are therefore not entitled to receive No-Fault reimbursements pursuant to State Farm v. Mallela, 4 N.Y.3d 313 (N.Y. 2005) and 11 NYCRR 65-3.16(a)(12).

**FIFTH CAUSE OF ACTION**
**(Restitution)**
**(Violation of the Business Corporation Law, Education Law and Regulation 68)**

204.     Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 203 above.

205.     Defendants Dr. Fray, Kotylar, John Does 1 through 20 and ABC Corporations 1 through 20, Rap Services and FRAY are jointly and severally liable for the acts and omissions set forth this Complaint.

206.     Pursuant to the Court of Appeals decision rendered in State Farm v. Mallela, 4 N.Y.3d 313 (N.Y. 2005) and 11 NYCRR 65-3.16(a)(12) a healthcare professional corporation or

professional limited liability company that is not duly owned and operated by a licensed healthcare professional is not entitled to receive No-Fault reimbursements.

207.    Had the Plaintiffs known of the illegal sale of a professional license and professional corporation and fraudulent content of the medical reports, treatment verifications, and bills for healthcare treatment, contrary to all indications of a legal and proper professional service corporation structure and professional, the Plaintiffs would not have paid the claims for No-Fault services submitted by or on behalf of Defendant FRAY.

208.    That as a result of the Defendants' actions, the Defendants received payments from the Plaintiffs that they were not entitled to receive and which they are not entitled to keep.  The Plaintiffs demand restitution in an amount in excess of Two Hundred Forty-One Thousand Eight Hundred Dollars and Nineteen Cents ($241,800.19) from Defendants Dr. Fray, Kotylar, John Does 1 through 20 and ABC Corporations 1 through 20, Rap Services and FRAY, jointly and severally.

**SIXTH CAUSE OF ACTION**
**(Declaratory Judgment-28 U.S.C. §§2201 and 2202)**
**(Breach of a Condition Precedent to Coverage)**

209.    Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 208 above.

210.    There is an actual case in controversy between GEICO and Defendant FRAY regarding more than Two Million Two Hundred Sixty-Five Thousand Two Hundred and Five Dollars and Twenty-Nine Cents ($2,265,205.29) in billing for healthcare services that has been submitted to GEICO.

211.    By virtue of Defendant's failure to appear for an EUO, the Defendant breached a material condition precedent to coverage established by the No-Fault Regulation and the subject

policy of insurance.

212.   The breach of a condition precedent to coverage has rendered Defendant FRAY ineligible to receive No-Fault reimbursements from GEICO.

213.   GEICO seeks a declaratory judgment that GEICO is under no obligation to pay, honor or reimburse the Defendant for the claim(s) submitted by the Defendant as set forth in **Exhibit "2"** for which an examination under oath was sought and for which the Defendant failed to appear.

## JURY DEMAND

214.   Pursuant to Federal Rule of Civil Procedure 38(b), Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demands a trial by jury.

**WHEREFORE,** Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, that the Defendants have no right to receive payment for any pending bills submitted to Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company;

B.   On the Second Cause of Action against the Defendants, compensatory damages in favor Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company an amount to be determined at trial but in excess of Two Hundred Forty-One Thousand Eight Hundred Dollars and Nineteen Cents

($241,800.19), together with, costs, interest and such other and further relief as this Court deems just and proper; and

C.      On the Third Cause of Action against the Defendants, more than Two Hundred Forty-One Thousand Eight Hundred Dollars and Nineteen Cents ($241,800.19), for unjust enrichment plus costs and interest and such other relief as this Court deems just and proper.

D.      On the Fourth of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, that Defendant FRAY is/was fraudulently controlled by laypersons, in violation of the Business Corporation Law, the Limited Liability Company Law, the Education Law and Regulation 68 and are therefore not entitled to receive No-Fault reimbursements pursuant to State Farm v. Mallela, 4 N.Y.3d 313 (N.Y. 2005) and 11 NYCRR 65-3.16(a)(12);

D.      On the Fifth Cause of Action against Defendants Dr. Fray, Kotylar, John Does 1 through 20 and ABC Corporations 1 through 20, Rap Services and FRAY more than Two Hundred Forty-One Thousand Eight Hundred Dollars and Nineteen Cents ($241,800.19), for restitution plus costs and interest and such other relief as this Court deems just and proper; and

E.      On the Sixth Cause of Action against Defendant FRAY, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, that the Defendant breached a material condition precedent to coverage under the applicable policies of insurance and No-Fault regulation by refusing and failing to appear for an EUO and that GEICO is under no obligation to pay, honor or reimburse the Defendant for any bill submitted and for which an EUO was requested.

Dated: Melville, New York
       August 23, 2019

53

**BRUNO, GERBINO & SORIANO, LLP**

By:  _____

Vincent F. Gerbino (VG 0555)
445 Broad Hollow Road, Suite 420
Melville, New York 11747
(631) 390-0010
(631) 393-5497 – *facsimile*
BG&S No.: 125-3022
*Counsel for Plaintiffs*

54